**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Civil Action No. 2:20-cv-1740** |
| Plaintiff, | |
| v. | **Judge: Wendy B. Vitter** |
| TRAFFIC JAM EVENTS, LLC, a limited liability company, and | **Magistrate: Dana Douglas** |
| DAVID J. JEANSONNE II, individually and as an officer of TRAFFIC JAM EVENTS, LLC, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

## I.  Introduction

Through official-looking envelopes and mock checks, Defendants Traffic Jam Events and its principal, David Jeansonne II, (collectively, "Traffic Jam Events" or "Defendants") have been using the promise of stimulus relief provided by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to lure consumers to auto sales events.   Specifically, Traffic Jam Events has been misrepresenting to individuals and families anticipating COVID-19 stimulus payments that: (i) the mailers concern official COVID-19 stimulus information, (ii) consumers will receive stimulus relief, including checks, by visiting a designated site, and (iii) the mailers involve a stimulus program associated with, or approved by, the government.   In fact, Traffic Jam Events is not providing official COVID-19 stimulus information or relief and is not affiliated or otherwise associated with, or approved by, the government or by any government agency.

Defendants' conduct violates Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). When challenging deceptive schemes like this, the FTC typically requests, and Fifth Circuit courts have regularly entered, temporary restraining orders ("TRO") and preliminary injunctions enjoining the deceptive activity.[1]   This case, in particular, warrants the requested relief: Defendants are recidivists.   Defendants already have been sued by the Florida Attorney General.[2]   In addition to Florida's current action, Traffic Jam Events has been subject to at least three prior enforcement actions in the states of Indiana and Kansas dating back to 2010 for using deceptive advertising campaigns promising incentives and prizes to lure consumers to auto sales events.[3]

## II.  The Parties

### A.  Plaintiff

The **Federal Trade Commission** is an independent agency of the United States government created by the FTC Act, 15 U.S.C. § 41 *et seq.*   The FTC is charged with enforcing Section 5(a) of the Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts and practices in or affecting commerce.   The FTC may, by its own attorneys, initiate federal district court proceedings to enjoin violations of the FTC Act and to secure appropriate equitable relief, including restitution and disgorgement, according to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

---

[1] *See infra* n. 67.

[2] In a separate, parallel action in Florida state court, the Florida Attorney General is also seeking a temporary restraining order against Defendants for the same illegal conduct at issue in the FTC's Complaint.   *See* Decl. of FTC Paralegal Emilie Saunders, attached as Plf's Ex. 1 (hereinafter, "PX1") ¶ 10, Atts. C-D.

[3] PX1 ¶¶ 11-16, Atts. E-H.

## B.  Defendants

**Traffic Jam Events LLC**, is a Louisiana limited liability company with its principal place of business at 2232 Idaho Avenue, Kenner, LA 70062.[4]   Traffic Jam Events provides advertising and marketing services to auto dealers, including staffed tent sales events.[5]

Individual Defendant **David J. Jeansonne II**, is the owner, managing member, and president of Traffic Jam Events.[6]

## III. Defendants' Deceptive and Unlawful Business Practices

Since at least March 2020, Defendants have mailed or caused to be mailed deceptive advertisements purporting to provide COVID-19 stimulus relief to consumers.   The mailers are sent in envelopes that claim to be "TIME-SENSITIVE" and that direct recipients to "OPEN IMMEDIATELY" because they contain "IMPORTANT COVID-19 ECONOMIC STIMULUS DOCUMENTS."[7]



---

[4]  PX1 ¶¶ 11-17, Atts. H-K.

[5]  PX1 ¶¶ 14, Att. I ¶¶ 10-12; Decl. of Michael Kastrenakes, attached as Plf's Ex. 2 (hereinafter, "PX2") ¶¶ 4-7.

[6]  PX1 ¶¶ 7-8, 17.

[7]  PX1 Att. C (Composite Exhibit A); Compl. Exh. A; *see also* PX1 ¶ 20, Att. M (Alabama mailer).

The enclosed notice states at the top in bold: "**URGENT: COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS AVAILABLE • ALL PAYMENTS DEFERRED FOR 120 DAYS.**"   The notice header also includes a barcode with a notice number that claims to relate to "COVID-19 STIMULUS (INDIVIDUAL)" and a watermark depicting the Great Seal of the United States.[8]   Below the header information, the notice claims in bold that "**[a] special COVID-19 Economic Automotive Stimulus Program with relief funds and other incentives will be held at 5925 SW 20th St., Bushnell, FL 33513**."[9]   A highlighted box touts specific relief similar to the CARES Act relief, including thousands in relief funds and payment deferrals.[10]

The notice repeatedly describes the location as "relief headquarters," "your designated temporary 10-day site," and "designated local headquarters."   In particular, the notice represents that consumers "must claim these stimulus incentives at your designated temporary 10-day site: 5925 SW 20th St., Bushnell, FL 33513."[11]

The mailers also include a mock check issued by "Stimulus Relief Program."[12]   The check's memo field states "COVID-19 AUTO STIMULUS" and includes a space to endorse the check on the back.

---

[8]  PX2 Exh. A; Compl. Exh. B.

[9]  PX2 Exh. A; Compl. Exh. B.

[10]  PX2 Exh. A; Compl. Exh. B.

[11]  PX2 Exh. A; Compl. Exh. B.

[12]  PX2 Exh. A; Compl. Exh. C.



In fact, however, the mailers do not provide official COVID-19 stimulus information;

consumers who visit the address in the mailers do not receive stimulus relief; and the mailers do

not involve a stimulus program associated with, or approved by, the government.   The address

specified in the mailers is the address for a lot used for car tent sales,[13] not a CARES Act relief

"headquarters."   Further, while the CARES Act was enacted to provide assistance—including

$1,200 stimulus payment to individuals and a $2,400 payment for married couples, with an

additional $500 payment per qualifying child, as well as deferrals or forbearance on

federally-backed mortgage and student loan payments—it does not provide any

automotive-related relief.[14]  And, 18 U.S.C. § 713 makes it a criminal offense to knowingly

display a likeness of the Great Seal "for the purpose of conveying, or in a manner reasonably

calculated to convey, a false impression of sponsorship or approval by the Government of the

United States or by any department, agency, or instrumentality thereof."

Consumers who leave their homes to receive the relief touted in the ads, including those

who would have otherwise chosen to shelter in place to avoid safety risks, will not receive the

promised CARES Act stimulus relief.   Defendants' mailings contribute to consumer confusion

---

[13] PX1 ¶ 18 and Att. I.

[14] P.L. 116-136, § 2201.

about CARES Act relief and may cause consumers to ignore other official CARES Act correspondence or fail to seek actual CARES Act benefits.[15]

## IV.  Individual Defendant Jeansonne

Defendant Jeansonne owns Traffic Jam Events.[16]  Corporate records identify him as Traffic Jam Events' president, manager, and owner.[17]  Jeansonne personally signed a consent agreement with the State of Indiana to resolve its civil action against Traffic Jam Events for sending deceptive mailers to lure consumers to car sales events.[18]  In addition, Jeansonne approved the content of the mailers and communicated with one of the dealerships about the campaign.[19]

## V.  A Temporary Restraining Order Should Issue Against Defendants

A TRO is needed to prevent continued harm.  The Court has the authority to order the relief sought, the FTC has met the standard for issuance of a TRO and Preliminary Injunction, and the requested relief is necessary.

---

[15] The rollout of the stimulus checks has been slow, leaving many consumers confused about when and how to obtain their payments.  *See, e.g.,* Naomi Jagoda, *Confusion reigns as IRS starts issuing coronavirus payments*, The Hill (Apr. 21, 2020), available at https://thehill.com/policy/finance/493789-confusion-reigns-as-irs-starts-issuing-coronavirus-payments (last checked June 15, 2020).

[16] PX1 ¶¶ 7-8.

[17] PX1 ¶¶ 7 (manager), 8 (owner), 17 (president); *see also* PX2 ¶ 5 (describing Jeansonne as the president of Traffic Jam Events).

[18] PX1 ¶ 17, Att. H.

[19] PX2 ¶¶ 7-9, 13, Exh. B (responding to dealer concerns by saying "If we are going to start watering down the pieces it won't work."); PX1 Att. D (Am. Compl. ¶ 37) ("Specifically, when a car dealership raised concerns about the content of the COVID-19 Stimulus Mailer, Jeansonne suggested that he and Traffic Jam were simply engaged in effective marketing. In April 2020, Jeansonne stated that while people are somewhat "running from COVID-19", everyone is running to "Stimulus Relief Funds".).

## A.  The Court Is Authorized to Grant the Requested Relief

Section 13(b) of the FTC Act authorizes the FTC to seek, and the Court to issue,

temporary, preliminary, and permanent injunctions.[20]   The second proviso of Section 13(b) states,

"in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent

injunction" against violations of any provision of law enforced by the Federal Trade

Commission.[21]   The Fifth Circuit and other courts have recognized that cases alleging violations

of a law enforced by the FTC constitutes a proper case for which injunctive relief may be sought.[22]

Under Section 13(b), the Court preserves its inherent authority to grant ancillary and preliminary

equitable relief.[23]

Here, where the public interest is at stake, exercise of the court's broad equitable authority

is particularly appropriate.[24]   The Fifth Circuit has held that a court may exercise the full breadth

of its equitable authority because "Section 13(b) contains no express limitations on the otherwise

full powers of the district court to mold appropriate decrees under its traditional equitable

---

[20] 15 U.S.C. § 53(b); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996) ("Section 13(b) of the Federal Trade Commission Act authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the [FTC]."); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 719 (S.D. Tex. 2008).

[21] The FTC is not proceeding under the first proviso of 13(b), which allows a court to issue temporary relief in aid of an administrative action brought by the FTC. Therefore, the procedural and notice requirements of the first proviso do not apply. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982).

[22] *FTC v. Sw. Sunsites*, 665 F.2d 711, 716-20 (5th Cir. 1982); *H.N. Singer, Inc.*, 668 F.2d at 1110-13.

[23] *Sw. Sunsites*, 665 F.2d at 718 (court authorized to "exercise the full range of equitable remedies traditionally available to it" in Section 13(b) actions); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *H.N. Singer*, 668 F.2d at 1112-13.

[24] *See Sw. Sunsites*, 665 F.2d at 718 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 397-98 (1946)); *see also FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346-47 (9th Cir. 1989).

jurisdiction . . . ."[25]   Thus, the Court has latitude to issue the full range of equitable relief, including a TRO to enjoin the deceptive practices.[26]

### B.  The Evidence Justifies Entry of a TRO

Preliminary relief is appropriate where the FTC is likely to succeed on the merits and the balances of the equities weighs in favor of the requested relief.[27]   The standard for preliminary injunctive relief under Section 13(b) differs from that typically applied to private litigants because the Commission is a governmental litigant acting as "a statutory guardian charged with safeguarding the public interest."[28]   When a statute establishes a right to injunctive relief and supplies the standards for granting that relief, those standards control and the normal equitable standards do not apply.[29]   "Unlike private litigants, the FTC need not demonstrate irreparable injury in order to obtain injunctive relief."[30]   The Fifth Circuit has stated that "[w]hen an injunction is expressly authorized by statute and the statutory conditions are satisfied, the movant need not establish specific irreparable injury to obtain a preliminary injunction."[31]   As set forth

---

[25] *Sw. Sunsites*, 665 F.2d at 719.

[26] *Id*. at 718; *H.N. Singer*, 668 F.2d at 1113-14; *FTC v. U.S. Oil & Gas Corp*., 748 F.2d 1431, 1432-34 (11th Cir. 1984); *see also* S. REP. No. 103-130, 1993 WL 322671, at *15 (1993) ("Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act].").

[27] *FTC v. Inv. Devs., Inc.*, Case No. 89-civ-642, 1989 WL 62564, at *5 (E.D. La. June 8, 1989); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991); *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988).

[28] *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2nd Cir. 1975).

[29] *Murry v. Am. Standard, Inc.*, 488 F.2d 529, 531 (5th Cir. 1973); s*ee EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1090 (5th Cir. 1987).

[30] *FTC v. GTP Mktg., Inc.*, Civil Action No. 4-90-123-K, 1990 U.S. Dist. LEXIS 3325, at *10 (N.D. Tex. March 15, 1990); *Investment Dev., Inc.*, 1989 U.S. Dist. LEXIS 6502 at *13.

[31] *Cosmair, Inc.*, 821 F.2d at 1090.   Although not required to do so, the FTC also meets the test for private litigants to obtain injunctive relief.   Consumers who would have otherwise chosen to

below, a TRO should issue because the FTC is likely to prevail on the merits of the case and the

balance of equities favors issuance of an injunction.

### 1. The FTC Is Likely to Succeed on the Merits

The district court need only find "some chance of probable success on the merits" to grant

an injunction.[32]   Here, the FTC's evidence of Defendants' violations is overwhelming.   As

discussed below, Defendants have violated and continue to violate Section 5 of the FTC Act.   The

FTC also can demonstrate that Individual Defendant Jeansonne is liable for the acts of the

corporate Defendant Traffic Jam Events.

*Defendants' Scheme Violates Section 5(a) of the FTC Act*

Defendants have violated Section 5(a) of the FTC Act by materially misrepresenting that:

(i) consumers are receiving official COVID-19 stimulus information, (ii) consumers are receiving

COVID-19 stimulus relief, including stimulus checks, and (iii) Defendants are affiliated or

otherwise associated with, or approved by, the government.

A representation, omission, or practice is deceptive under Section 5 of the FTC Act if it is

likely to mislead consumers acting reasonably under the circumstances and is material.[33]   To

determine whether a representation, omission, or practice is likely to mislead, courts consider the

---

shelter in their homes to avoid safety risks, but are misled by Defendants' express claims of COVID-19 financial relief, may suffer irreparable injury by unnecessarily risking their health and safety or by disregarding actual CARES Act relief or correspondence.

[32] *World Wide Factors, Ltd.*, 882 F.2d at 347 (quoting *United States v. Odessa Union Warehouse Co-op.*, 833 F.2d 172, 176 (9th Cir. 1987)); *see also FTC v. GTP Mktg., Inc.*, Civil Action No. 4-90-123-K, 1990 U.S. Dist. LEXIS 3325, at *10 (N.D. Tex. March 15, 1990).

[33] *See, e.g.*, *Kennedy*, 574 F. Supp. 2d at 721–22; *see also* FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1984) (appended to *In re Cliffdale Assocs.*, *Inc.*, 103 F.T.C. 110 (1984)).

overall net impression the representation creates.[34]   A representation is material if it is "likely to

affect a consumer's choice of, or conduct regarding, a product."[35]   "Express claims, or

deliberately made implied claims, used to induce the purchase of a particular product or service are

presumed to be material."[36]   The FTC has demonstrated that it is likely to succeed in

demonstrating the three elements of deception.

First, as discussed above, Defendants solicited consumers to dealerships with a

"TIME-SENSITIVE," official-looking mailer purporting to contain "IMPORTANT COVID-19

ECONOMIC STIMULUS DOCUMENTS."[37]   The notices themselves have claimed to be from

the "COVID-19 Economic Automotive Stimulus Program" and have carried the likeness of the

Great Seal of the United States.[38]   The notices also prominently emphasize "URGENT:

COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS

AVAILABLE" with a barcode and a notice number.[39]   The notices furthermore represent that

consumers "must claim these stimulus incentives at your designated temporary 10-day site,"

---

[34] *See, e.g.*, *FTC v. Direct Mktg. Concepts, Inc.,* 624 F.3d 1, 12 n.9 (1st Cir. 2010); *FTC v. Cyberspace.com, LLC,* 453 F.3d 1196, 1200 (9th Cir. 2006); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014); *Nat'l Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964) ("The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace."); *Porter & Dietsch v. FTC, Inc.*, 605 F.2d 294, 301 (7th Cir. 1979); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15, 930 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir 2008); *FTC v. Int'l Comp. Concepts*, Case No. 5:94-cv-1678, 1995 WL 767810, at *3 (N.D. Ill. 1995); *In re Daniel Chapter One*, 2009 WL 5160000, at *20 (F.T.C. Dec. 24, 2009).

[35] *Cyberspace.com*, 453 F.3d at 1201 (quoting *Cliffdale Assocs., Inc.*, 103 F.T.C. at 165).

[36] *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007) (citing *Thompson Medical Co.*, 104 F.T.C. at 816).

[37] *See supra* at 3; PX1 Att. C (Composite Exhibit A); Compl. Exh. A; *see also* PX1 ¶ 20, Att. J.

[38] *See supra* at 4; PX2 Exh. A; Compl. Exh. B.

[39] *See supra* at 4; PX2 Exh. A; Compl. Exh. B.

repeatedly referencing the location as "relief headquarters," "your designated temporary 10-day

site," and "designated local headquarters."[40]   To further the deception, the mailers have included

fake checks issued by "Stimulus Relief Program" in the amount of $3,344.68 with the memo field

stating "COVID-19 AUTO STIMULUS" and a space to endorse the check on the back.[41]

These mailers are likely to mislead consumers because Defendants' mailings are not

providing official COVID-19 stimulus information or stimulus relief and are not approved by or

otherwise associated with the government.[42]   Finally, the claims are material, not only because

they are express, but also because the promises of COVID-19 stimulus relief are likely to affect

consumers' decisions on whether to visit the advertised site, particularly in light of the pandemic.

The false promises of official relief might also lead consumers to ignore actual CARES Act relief

or forego true means of securing this relief.   Thus, the FTC is likely to prevail in showing that

Defendants violate Section 5 of the FTC Act.

### Defendant Jeansonne Is Individually Liable

Under the FTC Act, an individual is personally liable if "he either participated in the

unlawful activities or had some control over those activities."[43]   "Authority to control the

company can be evidenced by active involvement in business affairs and the making of corporate

policy, including assuming the duties of a corporate officer."[44]

---

[40]  *See supra* at 4; PX2 Exh. A; Compl. Exh. B.

[41]  *Supra* at 4-5; PX2 Exh. A; Compl. Exh. C.

[42]  *See* P.L. 116-136; PX1 ¶ 18.

[43]  *See, e.g.*, *FTC v. WebSource Media, LLC*, No. CIV.A. H-06-1980, 2007 U.S. Dist. LEXIS 101853, at **7-8 (S.D. Tex. July 2, 2007) (citing *FTC v. World Media Brokers, Inc.*, 415 F.3d 758, 764 (7th Cir. 2005)).

[44]  *WebSource Media, LLC*, 2007 U.S. Dist. LEXIS 101853 at *8 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)); *see also FTC v. Publ'g Clearing House, Inc.*, 104

"The FTC must demonstrate, in order to find an individual liable for restitution under section 13(b), that it had some knowledge of the subject practices."[45]   The FTC may satisfy the knowledge requirement by showing either actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.   The degree of participation in business affairs is probative of knowledge.[46]   The Commission need not show that the individual intended to defraud consumers to establish individual liability.[47]   "A company that deceives consumers through reckless or even simply negligent disregard of the truth may do just as much harm as one that deceives consumers knowingly."[48]

In this case, the FTC is likely to succeed in showing that Defendant Jeansonne's conduct satisfies the standard for individual liability.   Jeansonne possesses the authority to control Defendants' operations.   He organized Traffic Jam Events and is its owner, president, and manager.[49]   Thus, as the head of Traffic Jam Events,[50] Jeansonne had the authority to control the wrongful practices at issue.   When an individual is a "controlling shareholder of [] closely-held corporate defendants" or a corporate officer, a "substantial inference" exists that the individual has "the authority to control the deceptive acts and practices carried out in the name of his

---

F.3d 1168, 1170 (9th Cir. 1997).

[45] *FTC v. National Business Consultants, Inc.*, 781 F. Supp. 1136, 1145 (E.D. La. 1991).

[46] *See Publ'g Clearing House*, 104 F.3d at 1171; *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

[47]  *See Publ'g Clearing House*, 104 F.3d at 1171.

[48] *In re Sears Roebuck & Co.*, 95 F.T.C. 406, 517 n.9 (1980).

[49] *Supra* n. 6, and accompanying text.

[50] *Id.*

corporations."[51]

Further, while not at issue here, the FTC would likely succeed on the merits of showing Jeansonne's knowledge had it been seeking asset preservation for monetary relief.   Jeansonne signed a prior order promising his company would not send deceptive mailers to lure Indiana consumers to car sales events,[52] showing his awareness of prior allegations of such conduct and requiring him to ensure future mailers did not include such deceptive campaigns.[53]   Jeansonne also is involved in the creation and execution of Traffic Jam Events' marketing campaigns, including direct-mail solicitations and sales tent events,[54] and that, after one of Traffic Jam's client dealerships received a BBB complaint about a deceptive mailer, Jeansonne falsely represented that the Florida Attorney General's office reviewed and approved the marketing material.[55]

---

[51] *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) (quoting *FTC v. Windward Mktg., Inc.*, CIV. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17114, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997)).

[52] *See supra* at 6 and n. 18 (citing PX1 ¶ 17, Att. H).

[53] *FTC v. Moses*, 913 F.3d 297, 308 (2d Cir. 2019) (agreeing with lower court that "after the AOD was executed," the individual defendant was at least aware "of a high probability of fraud and intentionally avoided learning the truth" where it accused corporate defendants of violations of the FTC Act) (citing *FTC v. Fed. Check Processing, Inc.*, 2016 WL 5956073, at *13 (W.D.N.Y. Apr. 13, 2016); *FTC v. Adept Mgm't Inc.*, 2019 WL 1746581, at *39, *52, and *85-*86 (D.Or. Apr. 18, 2019) (awareness of cease and desist orders and signing of assurance of voluntary compliance established knowledge); *FTC v. SlimAmerica, Inc.*, 77 F.Supp.2d 1263, 1270-71 & 1275 (S.D. Fla. 1999) (noting entry of prior cease and desist orders and enforcement actions in support of imposing injunctive relief on individual defendants); *FTC v. Instant Response Sys., LLC*, 2015 WL 1650194, at *9 (E.D.N.Y. Apr. 14, 2015) (finding awareness of complaints probative of knowledge).

[54] *See supra* at 6 and n. 19; PX2 ¶¶ 7-9, 13 and Exh. B; *see also* PX1 ¶¶ 11-17, Atts. E-H.

[55] PX1 Att. D (Fla. Am. Compl. ¶ 39) ("Defendants provided false information to a Florida car dealership, claiming that. . . "all of our mail is reviewed by the attorney general."); *see also* PX1 Att. J (Ind. Compl. ¶ 11) (alleging that Traffic Jam Events claims "to prospective sponsor

## 2.   The Equities Weigh in Favor of Granting Injunctive Relief

The public interest in halting Defendants' unlawful conduct outweighs any interest

Defendants may have in continuing to unlawfully market their services.   In balancing the equities

between the public and private interest, "public equities receive far greater weight."[56]   The public

interest is especially strong in the context of enforcement of consumer protection laws. [57]   And,

because Defendants "can have no vested interest in business activity found to be illegal," a balance

of equities tips definitively toward granting the requested relief.[58] Additionally, compliance with

the law is hardly an unreasonable burden.[59]

The evidence demonstrates that the public equities—protection of consumers from

Defendants' unlawful scheme and effective enforcement of the law—weigh in favor of granting

the requested injunctive relief.   Consumers who are misled into believing that Defendants will

provide them with COVID-19 financial relief may unnecessarily risk their health and safety to

seek out the purported relief promised by Defendants' deceptive mailers or otherwise may

disregard actual CARES Act relief or correspondence.   Defendants' continued misleading

conduct despite numerous law enforcement efforts indicates that they will likely continue to

---

dealerships: 'Does the cheaper company run their ads through the AG [Attorney General]?
Because we do!' ").

[56] *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1030 (7th Cir. 1988); *FTC v. Inv. Dev., Inc.,* 1989 U.S. Dist. LEXIS 6502, at *13.

[57] *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011).

[58] *CFTC v. British Am. Commodity Options Corp*., 560 F.2d 135, 143 (2d Cir. 1977); *see also FTC v. Thomsen-King & Co., Inc.*, 109 F.2d 516, 519 (7th Cir. 1940) (stating that a court has no duty "to protect illegitimate profits or advance business which is conducted by unfair business methods.").

[59] *World Travel Vacation Brokers*, 861 F.2d at 1030.

deceive the public absent such relief.[60]

In contrast, any private equities are not compelling. "[T]here is no oppressive hardship to Defendants in requiring them to comply with the FTC Act [and] refrain from fraudulent representation."[61] Indeed, "the public interest in preventing further consumer deception outweighs [d]efendants' private interest in continuing to advertise and market its products and services in the same manner."[62] Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the requested injunctive relief outweigh any burden imposed by such relief on Defendants.

## C. The Requested Relief Is Necessary

The FTC requests that the Court grant a TRO and preliminary injunction prohibiting Defendants from making any misrepresentations; preventing release of consumer information;[63] preserving evidence;[64] and reporting future business activity.[65] The narrowly tailored relief

---

[60] *Five-Star Auto Club*, 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations.").

[61] *World Travel*, 861 F.2d at 1026

[62] *John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *16; *FTC v. City W. Advantage, Inc.*, 2008 WL 2844696, at *6 (D. Nev. July 22, 2008) (noting that "[t]here is no hardship to [defendants] in requiring them merely to follow the law-to refrain from making misrepresentations to consumers they contact").

[63] The prohibitions are consistent with the Court's broad equitable authority under Section 13(b) of the FTC Act to grant ancillary relief necessary to accomplish complete justice. *Direct Mktg. Concepts, Inc.,* 648 F. Supp. 2d 202, 212 (D. Mass. 2009); *Singer,* 668 F.2d at 1113; *Five-Star Auto Club, Inc.* 97 F. Supp. 2d at 532-39.

[64] It is appropriate to enjoin Defendants from destroying evidence and doing so would place no significant burden on them. *See SEC v. Unifund SAL,* 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing such orders as "innocuous").

[65] This provision is regularly entered by courts issuing TROs so that Defendants are deterred from immediately re-starting operations under a different name. *See, e.g.*, *FTC v. AH Media Grp., LLC*, Case No. 19-cv-04022-JD, Doc. No. 26 (N.D. Cal. July 18, 2019); *FTC v. Worldwide Executive*

requested is necessary,[66] and courts nationwide have routinely granted the FTC emergency relief

in similar cases, including issuing TROs with even broader relief than the FTC requests here.[67]

## VI. Conclusion

Defendants are harming consumers by deceptively touting fake COVID-19 stimulus relief.

The FTC respectfully requests the Court issue a TRO with the above-described relief in order to

protect the public from further harm and help ensure effective relief.

Dated: June 16, 2020                                  Respectfully submitted,

                                                     /s/ Sanya Shahrasbi
                                                     SANYA SHAHRASBI (D.C. Bar No. 1671001)
                                                     THOMAS J. WIDOR (D.C. Bar No. 490184)

---

*Job Search Solutions, LLC*, Case No. 4:19-cv-00495, Doc. No. 18 (S.D. Tex. Feb. 22, 2019).

[66] A proposed TRO was filed concurrently with the FTC's motion for TRO.

[67] *See, e.g.*, *FTC v. U.S. Grant Res., LLC*, No. 2:04-00596 (E.D. La. Mar. 2, 2004) (granting ex parte TRO with immediate access to premises and documents, records preservation, and new business reporting where defendants were misrepresenting their ability to provide consumers with government and private cash grants); *FTC v. Bob Robinson, LLC*, No. 4:17-cv-02411 (S.D. Tex. Aug. 8, 2017) (granting TRO requiring appointment of a receiver, immediate access to defendants' premises and documents, new business reporting, and expedited discovery where defendants misrepresented work-at-home opportunities); *FTC v. Goldman Schwartz, Inc.*, 4:13-cv-00106 (S.D. Tex. Jan. 16, 2013) (granting TRO with a receiver, prohibition on release of customer information, records preservation, new business reporting, and immediate access to premises and documents where defendants misrepresented their affiliation with the United States Government and the states); *FTC v. Abili-Staff, LTD*, SA10CA0088-OG (W.D. Tex. Feb. 2, 2010) (granting TRO prohibiting release of customer information, preserving records, and allowing expedited discovery where defendants' marketed work-at-home scams to consumers in times of financial distress); *FTC v. Strobel*, No. 2:08-CV-326 (E.D. Tex. Aug. 28, 2008) (granting TRO preserving records, requiring new business reporting, and allowing expedited discovery, where defendants misrepresented credit repair services); *FTC v. Payneless Credit Repair, LLC*, No. 3-08CV01160-M (N.D. Tex. July 10, 2008) (order granting TRO preserving documents, requiring new business reporting, and expedited discovery where defendants misrepresented credit repair services and state licensing and bonding).

Federal Trade Commission
600 Pennsylvania Ave., NW, CC-10232
Washington, DC 20580
(202) 326-2709 (Shahrasbi)
(202) 326-3039 (Widor)
sshahrasbi@ftc.gov
twidor@ftc.gov
Fax: 202-326-3768