# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1740-WBV-DMD** |
| **TRAFFIC JAM EVENTS, LLC, ET AL.** | **SECTION: D (3)** |

## <u>ORDER AND REASONS</u>

Before the Court is the Federal Trade Commission's Motion for A Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue against defendants, David J. Jeansonne, II (hereinafter, "Mr. Jeansonne"), individually and as an officer of Traffic Jam Events, LLC, and Traffic Jam Events, LLC (collectively, "Defendants").[1] Defendants oppose the Motion.[2]

The Court held an initial hearing on June 23, 2020, to determine whether the Federal Trade Commission (hereinafter, "FTC" or "the Commission") is entitled to a temporary restraining order.  At the request of counsel, that initial hearing was converted to a status conference with the Court.  A follow-up hearing was held on June 25, 2020.  After careful consideration of the Motion, the testimony and arguments presented during the hearing, the record and the applicable law, the Motion is **DENIED.**

---

[1] R. Doc. 3.
[2] R. Doc. 11.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Complaint

On June 16, 2020, the FTC, an independent agency of the United States government, filed suit under Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b), against Defendants.[3]  In the Complaint, the FTC alleges that  Traffic Jam Events, LLC "offers direct mail marketing services and staffed tent sales events to automotive dealerships."[4]  The FTC further alleges that David Jeansonne, II is the owner, managing member, and president of Traffic Jam Events, LLC[5]  and that, "Since at least March 2020, Defendants have mailed or caused to be mailed deceptive advertisements purporting to provide COVID-19 stimulus relief to consumers."[6]  The FTC asserts that Traffic Jam Events, LLC used the deceptive ads to "lure individuals and families to auto sales events under the guise that valuable stimulus relief was available at designated locations for a short period of time."[7]

The FTC claims that the mailing included statements such as, "URGENT:COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS AVAILABLE ● ALL PAYMENTS DEFERRED FOR 120 DAYS,"[8] and repeatedly described the location as, "your designated temporary 10-day site," "designated local headquarters," and "relief headquarters."[9]  The FTC further alleges that the mailing represented that consumers "must claim these stimulus incentives at your designated temporary 10-day

---

[3] R. Doc. 1.
[4] *Id*. at ¶ 6.
[5] *Id*. at ¶ 7.
[6] *Id*. at ¶ 9.
[7] *Id*. at ¶ 12.
[8] *Id*. at ¶ 14.
[9] *Id*. at ¶ 16.

site: 5925 SW 20th Street, Bushnell, FL 33513."[10]   A check allegedly issued by the "Stimulus Relief Program" was included in the mailing.[11]   The Complaint further alleges that, "The Florida Attorney General also sued Defendants on April 23, 2020 over the Florida mailers, yet Defendants continue to provide advertising and marketing services to the automotive industry nationwide."[12]   The FTC points out that Defendants have been the subject of prior law enforcement actions allegedly based on misleading advertising, two from Kansas (2010 and 2012) and one from Indiana (2018).[13]

Based on the foregoing facts, the FTC alleges that Defendants are violating or are about to violate laws enforced by the Commission, including unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).[14]   Pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC seeks the following relief:

- preliminary injunctive and ancillary relief, including a temporary and preliminary injunction, to prevent consumer injury during the pendency of this action;

- a permanent injunction to prevent future violations of the FTC Act;

- such relief that the Court finds necessary to redress injury to consumers, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

- litigation costs incurred by the FTC in bringing the action.[15]

---

[10] *Id.*
[11] *Id.* at ¶ 18.
[12] *Id.* at ¶ 20.
[13] *Id.*
[14] *Id.* at ¶¶ 21 & 26.
[15] *Id.* at pp. 8-9.

### B.  The Motion for Temporary Restraining Order

On the same day it filed the Complaint, June 16, 2020, the FTC filed the instant Motion for a Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause by a Preliminary Injunction Should Not Issue (the "Motion").[16]  The FTC asserts that, "through its advertising in direct-mail marketing, Defendants have been misrepresenting that (i) their mailers concern official COVID-19 stimulus information, (ii) consumers will receive stimulus relief, including checks, by visiting a designated site, and (iii) the mailers involve a stimulus program associated with, or approved by, the government."[17]  The FTC asserts that Defendants are not providing official COVID-19 stimulus information or relief and are not affiliated, or approved by, the United States government or any government agency.[18]  The FTC argues that Defendants' acts and practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).[19]

The FTC asserts that this Court has jurisdiction to enjoin violations of the FTC Act and to provide appropriate equitable relief, including restitution and disgorgement, according to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (hereafter, "Section 13(b)").[20]  The grounds asserted by the FTC in its Motion track the language of its Complaint, namely that Defendants "since at least March 2020 . . . have mailed or caused to be mailed deceptive advertisements purporting to provide COVID-19 stimulus relief to consumers."[21]  The description of the mailer is identical to the

---

[16] R. Doc. 3.
[17] *Id*. at 1.
[18] *Id*. at p. 2.
[19] *Id*.
[20] R. Doc. 3-1 at p. 2.
[21] *Id*. at p. 3; *See* R. Doc. 1 at ¶ 9.

description provided in the Complaint, including that the mailer contained statements indicating that it contained "Important COVID-19 economic stimulus documents," with the notice stating, "URGENT: COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS AVAILABLE."[22]   The mailers also included a mock check issued by the "Stimulus Relief Program."[23]

The FTC asserts that none of the information provided in the mailer is supported or authorized by the United States government or any governmental agency.  Quoting the Fifth Circuit in *EEOC v. Cosmair, Inc.,* the FTC argues that, "[w]hen an injunction is expressly authorized by statute and the statutory conditions are satisfied, the movant need not establish specific irreparable injury to obtain a preliminary injunction."[24]   The FTC then provides a detailed analysis of why it believes it is likely to succeed on the merits of its underlying claim that Defendants' actions violate Section 5(a) of the FTC Act, asserting that this Court need only find "some chance of probable success on the merits" to grant an injunction.[25]  The FTC also argues that Mr. Jeansonne is individually liable because the FTC has proven "he either participated in the unlawful activities or had some control over those activities."[26]   In support of this argument, the FTC alleges that Mr. Jeansonne possesses the authority to control Traffic Jam Event, LLC's operations and organizes Traffic Jam Events, LLC as its owner, president and manager.[27]   The FTC also

---

[22] R. Doc. 3-1 at p.p. 3-4; R. Doc. 1 at ¶¶ 13-14.
[23] R. Doc. 3-1 at p. 5.
[24] *Id*. at p. 8 (quoting *Cosmair, Inc.*, 821 F.2d 1085,1090 (5th Cir. 1987)) (internal quotation marks omitted).
[25] R. Doc. 3-1 at p. 9 (citing cases).
[26] *Id*. at p. 11 (quotation and quotation marks omitted).
[27] *Id*. at p. 12.

mentions that Traffic Jam Events, LLC has been subject to at least three prior enforcement actions in Indiana and Kansas dating back to 2010, for using deceptive advertising campaigns promising incentives and prizes to lure consumers to auto sales events.[28]  The FTC argues that it would likely succeed on the merits because Mr. Jeansonne signed three prior consent judgments on behalf of Traffic Jam Events, LLC, as a result of those prior proceedings.[29]  The FTC then balances the equities between the public and private interests in granting the requested injunctive relief, and argues that the public interest in halting Defendants' unlawful conduct outweighs any interest Defendants may have in continuing their unlawful marketing services.[30]

The following day, June 17, 2020, the Court set a telephone status conference for June 19, 2020, to discuss the Motion.[31]  On June 18, 2020, Defendants filed into the record Defendants' Memorandum Submitted in Advance of June 19, 2020 Status Conference, seeking to "address gross misrepresentations and omissions of fact and law" contained in the FTC's Complaint and Motion.[32]  During the June 19th telephone status conference, the Court discussed with counsel the status of the case and the pending Motion, and set the matter for a hearing on June 23, 2020.[33]

---

[28] *Id*. at p. 2 (*citing* R. Doc. 3-2 at ¶¶ 11-16; R. Doc. 3-3).
[29] R. Doc. 3-1 at p. 13.
[30] *Id*. at pp. 14-15.
[31] R. Doc. 6.
[32] R. Doc. 8.
[33] R. Doc. 9.

Thereafter, on June 22, 2020, Plaintiffs filed a Motion For Leave to File Supplemental Authority and Amended Proposed Temporary Restraining Order,[34] which the Court granted.[35]

That same day, June 22, 2020, Defendants filed an Opposition to the FTC's Motion for Temporary Restraining Order, asserting that the relief sought by the FTC is "extreme, unnecessary, and not justified by the law or the facts."[36]  Attached to the Opposition brief is a Declaration from Mr. Jeansonne, which Defendants assert "is submitted in lieu of live testimony upon agreement of the parties and the Court during the June 19, 2020 Status Conference."[37]  Defendants assert that Mr. Jeansonne's Declaration "makes clear that the Mailer at issue was past conduct that has not been repeated and will not be repeated in the future, and importantly, is the subject of a pending action in Florida state court."[38]  Defendants further assert that, since this involves "past conduct that has not been repeated and will not be repeated in the future" this case does not satisfy the express statutory requirement of Section 13(b) of the FTC Act that the Commission has reason to believe that an entity is violating or is about to violate any provision of the law.[39] Defendants point out that the purpose of Section 13(b) was to address the need to quickly enjoin ongoing or imminent illegal conduct.[40]

Defendants also assert that the issuance of a temporary restraining order will not serve the public interest, as required by Section 13(b), because there is no continuing or

---

[34] R. Doc. 10.
[35] R. Doc. 18.
[36] R. Doc. 11 at p. 2.
[37] *Id*. at pp. 1-2.
[38] *Id*. at p. 2.
[39] *Id*.
[40] *Id*. at p. 3.

future harm.[41]   Relying on Mr. Jeansonne's Declaration, Defendants assert that the mailer was part of a single mailing event distributed in two locales (Florida and Alabama), and that the sales associated with the mailer were one-time tent sales (one in Florida and one in Alabama) that took place over a single week.[42]   Defendants claim that, since these one-time sales, "no subsequent advertising programs of a similar nature have been used and Defendants have not distributed any other solicitation in substantially the same form as the Mailer."[43]   Defendants argue that this was an "isolated event" that "occurred in the past," and, therefore, does not justify a temporary restraining order.[44]   Regarding the previous consent judgments mentioned in the FTC's Motion, Defendants argue that those matters were completely distinct and unrelated to the COVID mailer at issue in the present suit.[45]   Defendants further argue that the Fifth Circuit's decision in *Southwest Sunsites* is distinguishable from this case and should not be interpreted to read out the express language of Section 13(b) that requires a continuing violation.[46]   Defendants point out that *Southwest Sunsites* involved a large-scale systematic scheme, which the Fifth Circuit found gave rise to a "fair inference of a reasonable expectation of continued violations absent restraint."[47]

The Court held a hearing on the Motion for Temporary Restraining Order on June 25, 2020.   With the consent of all parties, the FTC introduced copies of the mailer into

---

[41] *Id*.
[42] *Id*.
[43] *Id*. at pp. 3-4.
[44] *Id*. at p. 4.
[45] *Id*. at p. 6.
[46] *Id*. at p. 4 (citing *Federal Trade Com. v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)).
[47] R. Doc. 11 at pp. 4-5 (quoting *Southwest Sunsites, Inc.*, 665 F.2d at 723) (quotation marks omitted).

evidence, and Defendants introduced Mr. Jeansonne's Declaration into evidence in lieu of live testimony. At the request of the Court, Mr. Jeansonne testified during the hearing.

## II.   LEGAL STANDARD

Both the FTC and Defendants cite *Federal Trade Commission v. Southwest Sunsites, Inc.*,[48] as the leading authority on the issues raised in the FTC's Motion for Temporary Restraining Order. The Court finds that case controlling and instructive on a number of issues. First, the Court notes that *Southwest Sunsites* makes clear that the Commission can seek, and this Court has the authority to order, equitable relief, including injunctive relief, under Section 13(b) of the FTC Act. This Court adheres to that binding precedent and initially finds that it has the authority to enter an order of equitable relief in this matter.

This Court's analysis then proceeds to determine whether the FTC has satisfied the requirements set forth in Section 13(b) of the FTC Act to support the issuance of a temporary restraining order. Section 13(b) provides, in pertinent part, the following:

> Whenever the Commission has reason to believe,
>
> (1) That any person, partnership, or corporation is violating or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) That the enjoining thereof pending the issuance of the complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the Court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public - -

---

[48] 665 F.2d 711 (5th Cir. 1982).

> the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond… and in proper cases the Commission may seek, and after proper proof, the Court may issue a permanent injunction.[49]

The threshold analysis for a temporary restraining order under Section 13(b), therefore, is whether the Commission has reason to believe that Defendants are violating or about to violate any provision of law enforced by the Federal Trade Commission. One of the issues before the Fifth Circuit in *Southwest Sunsites* was whether there was a continuing violation of the FTC Act to support the district court's issuance of injunctive relief under Section 13(b).[50] Although the Magistrate Judge in that case found that there was no promotional or sales campaign currently in place, the Fifth Circuit affirmed the district court's granting of a temporary restraining order. In doing so, the Fifth Circuit reasoned that, "the evidence developed to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint."[51]

As recognized by our sister court, however, "the *Sunsite* court did not provide extensive guidance to district courts on applying § 13(b)'s threshold requirement,"

---

[49] 15 U.S.C. § 53(b).
[50] *Southwest Sinsites, Inc.*, 665 F.2d at 723-724.
[51] *Id.* at 723 (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

namely, a finding of Section 13(b) statutory compliance.[52]  Thus, "Following *Sunsites*, when applying § 13(b), district courts have analyzed whether the surrounding circumstances – in addition to the past violations alleged – create a reasonable expectation that violations will continue."[53]  In determining whether the evidence supports a reasonable expectation of continuing violations, courts in this Circuit consider the following non-exclusive factors: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) and the likelihood that the defendant's occupation will present opportunities for future violations.[54]

## III.   ANALYSIS

### A.   The FTC has failed to show that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC, as required by Section 13(b) of the FTC Act and Fifth Circuit precedent.

The Court begins its analysis with the crux of the case as put forth by the FTC. The evidence presented at the hearing reflects that Defendants created and mailed an advertising mailer in an official-looking envelope in March of 2020, which specifically referenced "COVID-19 automotive stimulus program relief funds," and,

---

[52] *Federal Trade Commission v. Educare Centre Services, Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020).
[53] *Id*. (citing *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008); *FTC v. Hughes*, 710 F. Supp. 1524, 1531 (N.D. Tex. 1989)).
[54] 549 F. Supp. 2d at 816.

"COVID-19 economic stimulus documents."[55]  The mailer included a document that appeared to be a check from the "Stimulus Relief Program."[56]  According to the evidence before the Court, there were 45,000 mailings that occurred for a one-time sales event which occurred over a one week period in Florida and Alabama.[57]  There was no evidence presented that future mailings offering COVID-19 stimulus relief were conceived, attempted, or contemplated.

The Court further notes the significant factual distinctions between *Southwest Sunsites*[58] and this case.  The facts established in *Southwest Sunsites* showed that the appellee began acquiring large tracts of land in Southwest Texas in 1973.[59]  After subdividing the land, the appellees conducted an extensive nationwide advertising and sales effort to offer parcels of between five and forty acres for sale for approximately $600 to $700 per acre, with representations that the property had good potential for both commercial and private owners.[60]  These representations were proven to be false.  The evidence further showed that the appellee's efforts were financially successful as "the total balance of outstanding accounts receivable on purchase contracts as of June 1979," some six years later, "was approximately $10,000,000."[61]  As noted earlier, the Fifth Circuit concluded that the district court acted "well within its discretion" in ordering appellee to cease and desist from further

---

[55] R. Doc. 3-2 at pp. 32-38.
[56] *Id*. at pp. 37-38.
[57] R. Doc. 11-1 at ¶¶ 6 & 9.
[58] 665 F.2d 711 (5th Cir. 1982).
[59] *Id*. at 714-15.
[60] *Id*. at 715.
[61] *Id*.

violations of the FTC Act.[62]   The Fifth Circuit explained that, "This is particularly true when the evidence developed to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint."[63]

It is clear from the evidence presented in this case that the mailer at issue was not part of a large-scale systematic scheme, but was part of "one advertising program,"[64] which was ultimately unsuccessful.[65]   The evidence shows that less than 40 people, combined, attended the Florida and Alabama events.[66]   The evidence before the Fifth Circuit in *Southwest Sunsites* showed a continuing, multi-year, fraudulent scheme that reaped at least ten million dollars.[67]   In contrast, the evidence before this Court shows that the mailer at issue was an unsuccessful, one-time mailing. Mr. Jeansonne testified during the June 25, 2020 hearing that the mailer was "beyond a flop"[68] because only approximately nine or ten vehicles were sold at the Florida sales event, while zero vehicles were sold at the Alabama sales event.[69] He further testified that Defendants lost $52,000 as a result of the unsuccessful mailer since they paid for the advertising at issue in this matter.[70]   The FTC did not

---

[62] *Id*. at 723.
[63] *Id*. (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).
[64] R. Doc. 11-1 at ¶ 9.
[65] *Id*. at ¶ 11.
[66] *Id*.
[67] 665 F.2d at 714-15.
[68] Draft transcript of June 25, 2020 hearing, p. 41.
[69] *Id*. at pp. 37-38.
[70] *Id*. at pp. 40-41.

offer any evidence to contradict Mr. Jeansonne's testimony.  Apparently, the targeted consumers were wiser than the Defendants who conceived this mailer.

The Court further notes that, during the June 25th hearing, counsel for the FTC stated, "We do not currently have evidence of other COVID-specific mailers that since have gone out since the Florida investigation."[71]  Counsel for the FTC then asserted, for the first time, "We do have additional evidence that suggests they may be continuing other deceptive advertising."[72]  The Court questioned counsel extensively regarding this newly provided information, during which counsel further stated, "We have found at least one complaint now involving one other mailer for events that took place as recently as June 3rd that resembles the same mailer that resulted in law enforcement action in Kansas."[73]  When asked whether this recent mailer involved "representation about COVID-19 stimulus relief" or anything similar to the representations at issue in this case, counsel answered, "No, Your Honor, but we do have additional potential deceptive representations that potentially violate the FTC Act."[74]  When the Court pressed counsel a second time as to whether the recent mailer involved any references to COVID-19 stimulus relief, FTC's counsel responded, "Your Honor, it does not—it does not involve specific COVID claims as I indicated.  It is still we think relevant because it still leads to deceptive advertising that's potentially in violation of the FTC Act."[75]

---

[71] *Id.* at p. 8.
[72] *Id.*
[73] *Id.* at p. 9.
[74] *Id.*
[75] *Id.* at p. 10.

Later in the hearing, the Court asked counsel for the FTC a few follow-up questions about the new information regarding a June 3, 2020 mailer. Specifically, the Court inquired, "Where is the information that you stated regarding possible sales in June or discussions of mailers in June of this year?"[76] Counsel for the FTC responded, "So, your Honor, that was what I was discussing earlier of other potentially deceptive conduct in violation of the FTC Act. We are happy to make that available to the court. We have just identified it as of yesterday."[77] The Court then asked counsel if the information was in evidence at the time of the hearing, to which counsel responded, "No, this was done in response to the questions that you had posed to the parties on Tuesday. As I mentioned earlier, we are still trying to collect information but it would certainly be information in defendant's possession."[78]

The Court finds that this new information does not establish that the FTC had reason to believe that Defendants were violating or were about to violate a provision of the FTC Act at the time it filed the instant Motion, as required under Section 13(b) of the FTC Act. Even if accepted on its face as true, the FTC's counsel was clear in stating that he was bringing *potential*, not established, violations to the Court's attention. As evidenced by the foregoing colloquy during the June 25, 2020 hearing, counsel for the FTC repeatedly confirmed that the recent mailer did not involve any references to COVID-19 stimulus relief or anything similar to the representations at issue in this case. Further, counsel for the FTC confirmed during the hearing that

---

[76] *Id*. at p. 27.
[77] *Id*.
[78] *Id*.

this new information was only prompted by questioning from the Court during a hearing that occurred two days earlier, on June 22, 2020. The FTC filed its Complaint and the instant Motion on June 16, 2020.[79] Thus, it is abundantly clear to Court that at the time the FTC filed the instant Motion on June 16, 2020, it was not aware of any additional mailers sent by Defendants after March 2020. Accordingly, the Court is not persuaded that the new information offered by the FTC during the June 25th hearing shows that the FTC had reason to believe that Defendants were violating or were about to violate the FTC Act when it sought injunctive relief under Section 13(b) of the FTC Act.

Based upon the foregoing evidence and the binding precedent set by *Southwest Sunsites*, the Court finds that the FTC has not proven that the Commission has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the Federal Trade Commission.

### B. The FTC has failed to establish a likelihood of continued violations under the *Cornerstone* factors.

The Court further finds that the FTC has failed to establish a likelihood of continued violations by Defendants based upon their past violations, as reflected in prior consent judgments, under the six non-exclusive factors set forth by our sister court in *FTC v. Cornerstone Wealth Corp., Inc.*[80] Regarding the egregiousness of Defendants' actions, the Court finds that this factor squarely weighs in favor of the FTC and in the Court granting the Motion for Temporary Restraining Order.

---

[79] R. Docs. 1 & 3.
[80] 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (citation omitted).

Defendants' actions, as alleged by the FTC, using a mailer which purported to provide financial relief during this global pandemic, preying upon people at a particularly vulnerable time not only for those people, but for the world, all in an attempt to make an automobile sale, are clearly egregious. Were the Court not analyzing this matter under factors enunciated by other courts, this Court would use stronger words to describe the egregiousness of this mailer.

Turning to the second factor, the isolated or recurrent nature of the infraction, the Court finds this factor weighs in favor of Defendants and against granting injunctive relief. The evidence presented by both the FTC and Defendants reflect that this was a one-time mailing of 45,000 mailers within Florida and Alabama.[81] There has been no evidence presented that there was any subsequent mailing related to potential COVID-19 stimulus relief since that one-time mailing. The evidence also shows that this mailing occurred in March 2020.[82] There has been no evidence presented to the Court indicating that Defendants were in preparation of, or intended to send, any subsequent mailing using similar language, and Mr. Jeansonne has submitted a Declaration stating that no subsequent mailing or similar mailing is intended or will be undertaken.[83] In response to the Court's question, "Since this mailing we're talking about, have you contemplated or had any discussions with anyone about any other  mailing including such language as COVID-19, stimulus, and stimulus recovery program," Mr. Jeansonne testified, "Absolutely not. . . . Since

---

[81] R. Doc. 11-1 at ¶¶ 6 & 9.
[82] *Id.* at ¶ 9; R. Doc. 3-2 at pp. 32-38.
[83] R. Doc. 11-1.

this one isolated incident, I've never used even the word, much less any type of factual information, never and never will."[84]

The FTC has brought to the Court's attention three prior consent agreements entered into by Defendants that resulted from three prior state court proceedings, two in Kansas and one in Indiana.[85]   The Court notes that the Fifth Circuit in *Southwest Sunsites* appeared to read the phrases "reason to believe" and "is violating" or "about to violate," as set forth in Section 13(b) of the FTC Act, as covering situations where defendants claim that the violations have ceased, but that the FTC provides evidence that the violations will continue absent injunctive relief.[86]   Such is the FTC's argument in this matter, relying on the past consent agreements entered into by Defendants.   The Court has reviewed all of the consent agreements and notes that the Kansas agreements are from 2010 and 2013, respectively,[87] and the Indiana consent agreement, while signed in 2019, is in reference to Traffic Jam Events, LLC's actions from 2015 and 2016.[88]   The Court also notes that the facts of those purported violations in Kansas and Indiana, which led to the consent agreements, differ from the facts of the case before this Court.   In almost each of those matters, Defendants purportedly offered prizes or the chance to win a prize to consumers if they appeared at some sales or marketing event.   None of those matters involved or included language related to any disaster or tragedy as shown in this case.   Based upon the

---

[84] Draft Transcript of June 25, 2020 hearing, p. 46.
[85] R. Doc. 3-3 at pp. 2-13, 15-20 & 60-66.
[86] *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 722-23 (5th Cir. 1982).
[87] R. Doc. 3-3 at pp. 2-13 & 15-20.
[88] *Id.* at pp. 60-66.

length of time between the three prior consent judgments and the actions in this case, which occurred in March 2020, and perhaps even more importantly, the significant factual differences between the three prior matters and the instant case, the Court finds that the second factor, the isolated or recurrent nature of the infraction, weighs in favor of the Defendants.

The Court finds that the third factor, the degree of scienter involved, weighs in favor of the FTC. Although not stated directly in Mr. Jeansonne's Declaration, the Court inquired during the June 25, 2020 hearing whether Mr. Jeansonne was aware of the contents of the March 2020 mailing. Mr. Jeansonne testified during the hearing that he was indeed aware of the mailer's content, testifying that he "takes full responsibility" and that the mailer was his idea.[89] The Court has not been presented with any evidence that Defendants lacked knowledge of the mailer's content. As a result, this factor weighs in favor of the FTC.

Regarding the fourth factor, the sincerity of Defendants' assurances against future violations, Mr. Jeansonne has provided a Declaration stating the following:

> Traffic Jam and David Jeansonne, II will not represent or imply to any consumers that official COVID-19 government stimulus funds, including but not limited to funds available under the Coronavirus Aid, Relief, and. [sic] Economic Security ("CARES") Act, are being offered by Traffic Jam and/or David Jeansonne, II, or any car

---

[89] Draft transcript of June 25, 2020 hearing, p. 39.

> dealership with which they work or provide advertising and marketing services to.[90]

The Declaration further provides that:

> Traffic Jam and David Jeansonne, II will not represent or imply to any consumers that Defendants or any car dealership with which they work are affiliated with, are supported, endorsed, certified, or licensed by, or are working in partnership with or as an agent of any government agency, for the purpose of providing official, government-issued COVID-19 stimulus relief funds or other government relief funds related to COVID-19 as currently enacted.[91]

Additionally, this Court had the opportunity to question Mr. Jeansonne directly regarding his assurances against future violations during the June 25, 2020 hearing. In doing so, the Court was able to observe his demeanor and evaluate the sincerity of his testimony, and the Court finds that this factor weighs in favor of Defendants. While Mr. Jeansonne did not acknowledge the wrongful nature of his conduct, the Court is satisfied that Mr. Jeansonne's assurances regarding future violations are sincere. Mr. Jeansonne acknowledged that his business suffered financial losses as a result of his decision to use this advertising campaign. He further testified that his 21-year reputation in the advertising business, past awards, and engagements as a motivational speaker had been damaged as a result of his actions.[92] While it was clear that those matters which affected him personally weighed significantly in Mr. Jeansonne's determination not to have future violations, the Court is convinced of his sincerity, even if for selfish reasons. Further, there has

---

[90] R. Doc. 11-1 at ¶ 19.
[91] *Id.* at ¶ 20.
[92] Draft transcript of June 25, 2020 hearing, pp. 43-44.

been no evidence presented to the Court that Mr. Jeansonne has been insincere. Accordingly, the fourth factor weighs in favor of Defendants.

The Court finds that the fifth factor, Defendants' recognition of the wrongful nature of their conduct, weighs in favor of the FTC.  During the June 25, 2020 hearing, the Court explicitly asked Mr. Jeansonne if he thought the mailer in question preyed on consumers' vulnerabilities, to which he responded, "I absolutely do not."[93]  Mr. Jeansonne also testified that he still believes the mailer was legal and the intent was to use catchy phrases to get the attention of consumers.[94]  As such, the Court finds that the fifth factor weighs in favor of the FTC and in granting injunctive relief.

The Court further finds that the sixth and final *Cornerstone* factor, the likelihood that Defendants' occupation will present opportunities for future violations, appears, at least on its face, to weigh in favor of the FTC.  Mr. Jeansonne remains the president and owner of Traffic Jam Events, LLC, and defense counsel confirmed during the June 25, 2020 hearing that Traffic Jam Events, LLC remains in the business of direct mail advertising.  The Court questioned defense counsel about the extent of Traffic Jam Events, LLC's current business during the hearing, and counsel stated that the entity is in the advertising business, describing advertising as its "bread and butter."[95]

---

[93] Draft transcript of June 25, 2020 hearing, pp. 42-43.
[94] *Id.*
[95] *Id.* at p. 33.

However, the evidence before the Court also shows that the Attorney General of the State of Florida has instituted legal proceedings against Defendants involving the same mailer at issue in the instant case.[96]  That suit has been pending since April 2020.  Counsel for both parties confirmed during the June 25, 2020 hearing that those legal proceedings remain pending.[97]  Defendants are also aware that at least one automotive dealer in Florida is in discussions to cooperate with the Attorney General of Florida to pay restitution to customers who appeared at the tent sale and to hold some other amount of money for "future enforcement efforts."[98]  Counsel for the FTC has also informed the Court that Defendants' mailer has become the topic of several news stories, and Mr. Jeansonne testified to the many news stories associated with his actions.[99]  In light of the evidence that Defendants are in a legal action currently pending in state court in Florida, that the Attorney General of Florida is seeking, or has obtained, the cooperation of automobile dealers from Florida with whom Defendants worked, and that there is media coverage of Defendants' actions, the Court finds the sixth factor is either neutral, or weighs slightly in favor of Defendants. The Court would not be going out on a limb to suggest that ongoing legal action, media coverage, and the potential for additional automobile dealers to be cooperating with legal authorities would very likely curtail any opportunities for future violations.

Having analyzed the evidence adduced at the hearing and on the record in this case using the *Cornerstone* factors, the Court finds that the factors do not clearly

---

[96] R. Doc. 3-2 at pp. 40-58.
[97] Draft transcript of June 25, 2020 hearing, pp. 26-27 & 49-50.
[98] R. Doc. 11-1 at ¶ 14.
[99] Draft transcript of June 25, 2020 hearing, pp. 40-42, 44-45.

weigh in favor of the FTC or Defendants.  As set forth above, three factors weigh in favor of the FTC and three factors weigh in favor of Defendants.  Nonetheless, the Court finds that injunctive relief is not warranted in this case.  First, the Court has already determined that the facts of this case are significantly distinguishable from the facts in *Southwest Sunsites*, and that the FTC has not borne its burden of proving that, at the time it filed this Motion, it had reason to believe that Defendants were violating, or were about to violate, any provision of law enforced by the FTC, as required to obtain injunctive relief under Section 13(b).  Second, and more importantly, the Fifth Circuit has made clear that, "A preliminary injunction is an extraordinary remedy," and that, "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[100]  Thus, injunctive relief remains an extraordinary measure, and one not to be ordered lightly.

The sole issue before the Court is whether, based on the evidence in the record today, the FTC has met the statutory requirements set forth in Section 13(b) for the issuance of a temporary restraining order.[101]  The Court finds that it has not.  The FTC has failed to prove that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC.  The Court agrees with defense counsel's assertion during the June 25, 2020 hearing that the instant Motion constitutes an overreach by the FTC of its authority to seek injunctive relief under Section 13(b).  This may be due, at least in part, to the FTC's fundamental

---

[100] *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621-22 (5th Cir. 1985) (citation omitted).
[101] *See* 15 U.S.C. § 53(b).

misunderstanding of the Fifth Circuit's decision in *Southwest Sunsites*, and its assertion that, "the Fifth Circuit explicitly rejected the defendant's argument that the FTC needed to show continuing or future violations for the case to be heard in federal court."[102]  As previously discussed, the Fifth Circuit in *Southwest Sunsites* affirmed the district court's decision to grant injunctive relief, concluding that the evidence "suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of *continued violations'* absent restraint."[103]  The FTC has failed to present the Court with evidence showing that it has a reasonable expectation of continued violations absent injunctive relief.

While the Court finds that the FTC has not sustained its burden of proving that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC, the Court specifically makes no finding regarding whether the FTC will succeed on the merits of its Complaint, or whether the FTC will succeed in proving that Defendants have previously violated any provision of law enforced by the FTC.  That determination, which carries its own penalties, is not before the Court at this time.  While the well-known phrase is "buyer beware," the Court would suggest that advertiser beware.

---

[102] R. Doc. 10-1 at p. 1 (citing *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982)).
[103] 665 F.2d at 723 (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)) (emphasis added).

IV.     CONCLUSION

**IT IS HEREBY ORDERED** that the Motion for A Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue[104] is **DENIED.**

New Orleans, Louisiana, June 26, 2020.

**WENDY B. VITTER**
**United States District Judge**

---

[104] R. Doc. 3.